IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES McKINLEY MOORE,

      Petitioner,              No. CIV S-03-1128 GEB DAD P

   vs.

WARDEN ADAMS,

      Respondent.           FINDINGS & RECOMMENDATIONS

_____/

       Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on September 26, 2000 in the Sacramento County Superior Court on charges of attempted murder and assault with a deadly weapon.  He seeks relief on the grounds that: (1) the trial court erred by directing the jury to continue deliberations on one of the counts against him after the jury informed the judge that they were unable to reach a unanimous verdict on that count; and (2) his right to due process was violated when the trial court failed to give a jury instruction concerning petitioner's mental condition.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

A jury convicted defendant Charles McKinley Moore of attempted murder (Pen.Code, §§ 664, 187, subd. (a)),[2] Count One, and found the attempted murder to be willful, deliberate and premeditated (§§ 664, subd. (a), 187, 189.)  The jury also convicted defendant of assault with a deadly weapon (§ 245, subd. (a)(1)), Count Two.  The jury also found true that during the commission of both offenses defendant used a deadly weapon (§ 12022, subd. (b)(1)) and inflicted great bodily injury (§ 12022.7, subd. (a)).  Defendant received a sentence of life with the possibility of parole plus a consecutive four-year term.

* * *

On the morning of February 7, 2000, the victim, Christine S., arrived in her vehicle in the area near McClatchy Park in Sacramento.  The victim was to attend a meeting scheduled to take place at 11:30 a.m.

The victim parked her vehicle on 35th Street and, because she was early, decided to remain in her vehicle to finish the apple she was eating.  While sitting in her vehicle, the victim noticed defendant standing approximately a block away, "kind of hanging out," and looking in her direction.  A brown car then pulled up and parked near where defendant was standing.  The victim observed defendant walk toward the front of the brown vehicle.  When defendant got within three feet of the vehicle he stopped, then backed away to his original position while still facing the car.  The victim continued to eat her apple, losing track of defendant.

After approximately 10 to 15 minutes, the victim got out of her car with the intention of attending her meeting.  As she walked toward the entrance of the building where the meeting was to take place, defendant came out of a doorway and lunged at her with a knife, sticking it into her abdomen.  The victim likened the impact to being hit by a train, claiming defendant stabbed her with all of his might and effort.

The victim, a green belt in martial arts, reacted by striking defendant with her elbow, backing him off of her.  The victim credited this maneuver with saving her life.  After being stabbed, the victim entered the building and emergency personnel were called to assist.

---

[1]  The following summary is drawn from the published opinion in People v. Moore, 96 Cal. App. 4th 1105, 1108-1111 (2002).

[2]  Undesignated statutory references are to the Penal Code.

Security guard Ruben Cantu responded to the scene and made contact with defendant, who admitted he had stabbed the victim. Cantu described defendant as quiet and cooperative.

Sacramento Police Officer Larry Barja also responded.  When Barja arrived, he noticed defendant on the ground, with Cantu holding defendant at gun point.  Barja handcuffed defendant and placed him in the patrol car.  Defendant told Barja that he stabbed the victim because he "'just felt like doing it.'"  Defendant did not know the victim, but stabbed her because "'she was here at the time.  Wrong place, wrong time, so to speak.'"  If the victim had not been present, defendant would have stabbed someone else: he "'just wanted to stab somebody.'"  Barja described defendant's mood as quiet, calm and cooperative.  Defendant had no trouble relating personal information to the officer upon request, including that he had no mental history and was not under a doctor's care.

The knife used in the stabbing had a brown and white handle and was eight inches long, with a blade that was approximately four inches long.

Amy G., who worked at the building where the meeting was to take place, made contact with defendant immediately after the stabbing.  Amy testified defendant's eyes looked glazed and he appeared to be under the influence.

As she was being wheeled to an ambulance, the victim identified defendant as the person who stabbed her.

The medical testimony established the victim sustained a single stab wound to the right abdomen.  The wound, three to four inches deep, penetrated the victim's fascia and abdominal cavity, causing injury to a kidney and the mesentery of her colon.  The victim required surgery, and eventually spent eight days in the hospital and over eight weeks convalescing.  The stab wound posed a substantial risk of death.

DEFENSE

Testifying on his own behalf, defendant claimed he had a good recollection of the events that occurred on February 7, 2000. Defendant had never met or spoken to the victim prior to that time, had never been under the care of a psychiatrist or psychologist, nor had he been prescribed any type of medication.

Defendant testified he had been homeless and was not getting much sleep.  He had no money, nor had he eaten in the day or so leading up to the stabbing.

Defendant claimed he had used rock cocaine on and off since 1991. He estimated he had smoked it one to two thousand times.

3

However, he had not smoked the drug for two months prior to the evening of February 6, when he met some men in downtown Sacramento and together they smoked rock cocaine through most of the night.  Defendant believed he smoked between three-quarters to one gram of rock cocaine, taking his last hit around the time the sun came up on February 7, 2000.

Defendant then walked to McClatchy Park and, after staying there for a while, moved across the street to the building where the victim's meeting was to take place.  Defendant denied approaching the man in the brown car or intending to stab him.

Defendant testified he sat in the alcove for about 10 to 15 minutes. He pulled out his knife to clean his fingernails.  At that time, defendant thought of stabbing someone.  Defendant claimed he was feeling anxious, paranoid, and depressed because of the cocaine he had smoked.

After a short time, defendant got up to walk back downtown. When he emerged from the alcove, he again had the thought of stabbing someone.  At that time he saw the victim, just outside the alcove.

According to defendant, everything happened quickly.  He held his knife in his right hand and as he approached the victim, he stabbed her and then kept walking.  Although he wanted to stab the victim, he had no intention of killing her.  Instead, he just wanted to see what it would be like to stab someone.

After the stabbing, defendant walked a few steps and then stopped, dropping the knife to the ground.  He then yelled to Amy and another woman to call the police and "get the lady some help, she [has] been stabbed."

On cross-examination, defendant testified it was his intent to stab someone on the day in question.  Defendant believed the "dope" was the reason he committed the act, although he never mentioned this fact to the police or to the attending nurse when he was taken to the hospital immediately after the incident.  To the contrary, defendant denied using drugs when asked by the nurse.

Dr. Fred Rosenthal also testified on behalf of the defense.  Dr. Rosenthal, a physician practicing psychiatry and certified in psychology and neurology, testified he has treated thousands of patients involved in the use of cocaine.

Dr. Rosenthal did not interview defendant.  Instead, his testimony consisted of explaining, generally, the effects rock cocaine can have on people using the drug.  Dr. Rosenthal explained rock cocaine is usually smoked and acts as a stimulant, causing increases in blood pressure, temperature and heart rate.  The drug is

extremely addictive and produces an abnormal chemical environment in the brain.

Dr. Rosenthal further testified it is not uncommon for a chronic user to develop delusional ideas, including becoming psychotic, hearing voices and having visual hallucinations. A person in a psychotic state can become irrational, compulsive, and impetuous and lack control over his behavior. These effects can be exacerbated by sleep deprivation and by failure to eat properly. Memory can also be impaired by the use of cocaine.

On cross-examination, Dr. Rosenthal conceded that not all users become psychotic or irrational. Dr. Rosenthal further conceded the effects of rock cocaine can vary from person to person. Because Dr. Rosenthal did not examine defendant, he did not provide any opinion whether defendant was suffering from a drug-induced psychosis at the time of the stabbing.

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

1                (1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law, as
2         determined by the Supreme Court of the United States; or

3                (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
4         State court proceeding.

5  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

6  (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

7        The court looks to the last reasoned state court decision as the basis for the state

8  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

9  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

10  federal habeas court independently reviews the record to determine whether habeas corpus relief

11  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

12  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

13  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

14  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

15  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

16  1167 (9th Cir. 2002).

17  II.  Petitioner's Claims

18        Petitioner raises two claims of jury instruction error.  After setting forth the

19  applicable legal principles, the court will evaluate these claims in turn below.

20     A.  Legal Standards

21        A challenge to jury instructions does not generally state a federal constitutional

22  claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119);

23  Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for

24  alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see

25  also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

26  1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed

6

by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980));  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.")  The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious effect" on the outcome.  See McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993).

In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil, 843 F.2d at 317 (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v. Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

/////

/////

////

7

B.  Allen Charge

Petitioner's first claim is stated, in full, as follows:

> The court instructed the jury to further deliberate on count one with an Allen like charge.  When a jury has deliberated actively over a period of days informs the court that it can not reach a unanimous verdict, should not the court at least inquire of the jurors whether there is a reasonable probability further deliberation will likely result in a unanimus (sic) verdict.

(Second Amended Petition, filed on October 18, 2004 (hereinafter Pet.) at 5.)  Petitioner is claiming, in essence, that the trial judge gave an improper Allen charge to the jurors upon being informed that they were unable to reach a verdict on the count of attempted murder, and that the Allen charge effectively coerced the jury to reach a unanimous verdict against him on that count in violation of his right to an impartial jury.

The California Court of Appeal fairly explained the background to petitioner's claim in this regard as follows:

> Jury deliberations began on the morning of August 24, 2000.  The jury continued to deliberate through the afternoon and recessed after requesting defendant's testimony to be reread.  On the morning of August 25, 2000, the jury advised the court in writing that they were able to reach a verdict on Count Two, but could not reach a unanimous vote on Count One.

> In response, and over a defense objection, the court directed the jury to deliberate further as to Count One, reading them the following instruction:

> "What I am going to do right now, ladies and gentlemen, is I have further instructions and directions to give you as to Count One....

> "It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it.  To assist you in your further deliberations, I'm going to further instruct you as follows:

> "Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs.  You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors.  It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"Both the People and the defendant are entitled to the individual judgment of each juror.

"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.  May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider to change the methods you have been following, at least temporarily and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa.  This might enable you to better understand the other's positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations.  I merely find you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you reread CALJIC instruction 1.00 on page 1 and 1-A, CALJIC instruction 17.40 on page 40, and CALJIC instruction 17.41 on page 41.  These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.

"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions. CALJIC instruction 1.00 defines the duties of a juror.

"The decision the jury renders must be based on the fact[s] and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source. A fact is something proved by the evidence or by stipulation.

"Second, you must apply the law I state to you to the facts as you determine them and in this way, arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflict[s] with my instructions on the law, you must follow my instructions.

"CALJIC 17.40 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"CALJIC 17.41 is an instruction which recommends how jurors should approach their task.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you. I hope my comments and suggestions may have some assistance to you.

"You're ordered to continue your deliberations at this time. If you have other questions, concerns, requests or any communications you desire to report to me, please put those in writing on the form my bailiff has provided you with. Have them signed and dated by your foreperson and then please notify the bailiff."

Following the trial court's additional instruction, the jury recessed for the weekend following the afternoon of August 25, 2000, and returned on the morning of August 28, 2000, when a verdict of guilty was reached on Count One after two additional hours of deliberation.

Moore, 96 Cal. App. 4th at 1118-1120.

/////

/////

On appeal, petitioner argued that the trial court's supplemental instruction was coercive and improper.  The California Court of Appeal rejected these arguments, reasoning as follows:

> In Allen v. United States (1896) 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 531, the Supreme Court approved a charge (the Allen charge) which encouraged the minority jurors to reexamine their views in light of the views expressed by the majority, noting that a jury should consider that the case must at some time be decided.  In People v. Gainer (1977) 19 Cal.3d 835, 139 Cal.Rptr. 861, 566 P.2d 997, however, our state high court disapproved of Allen in two respects.  The Gainer court found "the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views" was improper, inasmuch as, by counseling minority jurors to consider the majority view, whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as the basis of their verdict.  (Gainer, at pp. 845, 848, 139 Cal.Rptr. 861, 566 P.2d 997.)  The second issue with which the Gainer court took issue was the direction the jury "'should consider that the case must at some time be decided,'" noting such a statement was inaccurate because of the possibility the case might not be retried.  (Id. at pp. 851-852, 139 Cal.Rptr. 861, 566 P.2d 997.)  In other words, it is improper to instruct the jury in language that suggests that if the jury fails to reach a verdict the case necessarily will be retried.  (Ibid.)

> The trial court's additional instruction in this case did not constitute an improper Allen charge.   The trial court did not direct the jurors that "the case must at some time be decided."  To the contrary, the court instructed that the "goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard to the consequences of your verdict [or] regardless of how long it takes to do so."  (Italics added.)   Nothing in the trial court's charge was designed to coerce the jury into returning a verdict.  (People v. Miller (1990) 50 Cal.3d 954, 994, 269 Cal.Rptr. 492, 790 P.2d 1289.)  Instead, the charge simply reminded the jurors of their duty to attempt to reach an accommodation.

> Additionally, the court directed the jurors to consider carefully, weigh and evaluate all of the evidence presented at trial, to discuss their views, and to consider the views of their fellow jurors.  Finally, the court instructed that it was their duty as jurors to deliberate with the goal of arriving at a verdict on the charge "if you can do so without violence to your individual judgment."  (Italics added.)

> Contrary to defendant's argument on appeal, the jury was never directed that it was required to reach a verdict, nor were any

11

constraints placed on any individual juror's responsibility to weigh and consider all the evidence presented at trial.  The trial court also made no remarks either urging a verdict be reached or indicating possible reprisals for failure to reach an agreement.  In short, it is clear the trial court took great care in exercising its power "without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency.... Nothing in the trial court's comment in the present case properly may be construed as an attempt to pressure the jury to reach a verdict...." (People v. Proctor (1992) 4 Cal.4th 499, 539, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)

Defendant criticizes the trial court for not ascertaining whether there was a reasonable probability the jurors could agree on a verdict before giving them additional instructions.  However, section 1140 vests the trial court with discretion to determine whether there is a reasonable probability of agreement among jurors who have reported an impasse.  (People v. Proctor, supra, 4 Cal.4th at p. 539, 15 Cal.Rptr.2d 340, 842 P.2d 1100; People v. Carter (1968) 68 Cal.2d 810, 815-816, 69 Cal.Rptr. 297, 442 P.2d 353.)  In this case, and presumably because of the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict on Count One, the trial court concluded further deliberations might be beneficial without questioning the jury regarding the impasse.  The fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion.

The trial court did not err in giving the challenged instruction. Indeed, the trial judge (Judge Michael G. Virga) should be commended for fashioning such an excellent instruction.

Moore, 96 Cal. App. 4th at 725-28.

Whether the comments and conduct of a state trial judge infringe a defendant's due process right to an impartial jury and fair trial turns upon whether "the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision."  Locks v. Sumner, 703 F.2d 403, 406 (9th Cir. 1983).  See also Jiminez v. Myers, 40 F.3d 976, 979 -980 (9th Cir. 1993) (inquiry into numerical division in balloting amounted to a "de facto Allen charge").  A reviewing court considers whether the court's actions and statements were coercive in the totality of the circumstances.  See Locks, 703 F.2d at 406-07 ("the inquiry by the judge must be viewed in light of the context in which it was made, not in isolation") (citations omitted);  United States v. Seawell, 550 F.2d 1159, 1163 (9th Cir. 1977)

1  ("the general test of whether a supplemental jury instruction is in error is to consider all the

2  circumstances to determine if the instruction was coercive") (citation omitted);  Marsh v. Cupp,

3  536 F.2d 1287, 1290 (9th Cir. 1976) (test for jury coercion is "'whether in its context and under

4  all the circumstances of this case the statement was coercive'") (quoting Jenkins v. United States,

5  380 U.S. 445 (1965)).

6          An "Allen charge" is

7      the generic name for a class of supplemental jury instructions given
       when jurors are apparently deadlocked; the name derives from the
8      first Supreme Court approval of such an instruction in Allen v.
       United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41 L.Ed. 528
9      (1896).  In their mildest form, these instructions carry reminders of
       the importance of securing a verdict and ask jurors to reconsider
10     potentially unreasonable positions.  In their stronger forms, these
       charges have been referred to as "dynamite charges," because of
11     their ability to "blast" a verdict out of a deadlocked jury.  The
       charge has also been called the "third degree instruction," "the
12     shotgun instruction," and "the nitroglycerin charge."

13  United States v. Berger, 473 F.3d 1080, 1089 (9th Cir. 2007) (quoting United States v. Mason,

14  658 F.2d 1263, 1265 n.1 (9th Cir. 1981)).  The Allen charge, "while productive of continued

15  comment and debate, is nevertheless an instruction that has been accepted for many years."

16  Mason, 658 F.2d at 1265.  The Allen instruction is most often used in cases of "apparent juror

17  deadlock" to "admonish jurors to keep trying."  Id.  "In the archetypal Allen charge context, the

18  judge instructs a deadlocked jury to strive for a unanimous verdict."  Weaver v. Thompson, 197

19  F.3d 359, 365 (9th Cir. 1999).  "So long as the defendant has offered facts that fairly support an

20  inference that jurors who did not agree with the majority felt pressure from the court to give up

21  their conscientiously held beliefs in order to secure a verdict," a reviewing court must "proceed

22  to the Allen charge analysis."  Id.  This court will assume that the trial court's supplemental jury

23  instruction in this case constituted an "Allen charge."

24          "There is . . . nothing talismanic about any single element either making the

25  [Allen] charge valid or invalid; the fundamental question is whether the jury was improperly

26  coerced, thus infringing the defendant's due process rights."  Id.  The Ninth Circuit Court of

1    Appeals has identified four factors to assist a reviewing court in determining whether a

2    supplemental jury instruction of this kind violates due process: "(1) the form of the instruction,

3    (2) the time the jury deliberated after receiving the charge in relation to the total time of

4    deliberation and (3) any other indicia of coerciveness." Berger, 473 F.3d at 1090 (quoting United

5    States v. Steele, 298 F.3d 906, 911 (9th Cir. 2002)). See also Weaver, 197 F.3d at 366.

6              Considering the first factor, the trial judge's supplemental instruction in this case:

7    (1) informed the jurors that they had "the absolute discretion to conduct your deliberations in any

8    way you deem appropriate;" (2)  emphasized that the jury was the final arbiter of witness

9    credibility; (3) informed the jurors that their "goal as jurors should be to reach a fair and

10   impartial verdict if you are able to do so based solely on the evidence presented" and "without

11   doing violence to your individual judgment;" (4) phrased the judge's comments as suggestions;

12   and (5) emphasized that the trial judge was not "dictating or instructing you as to how to conduct

13   your deliberations." Moore, 96 Cal. App. 4th at 1119.  Further, while the instruction informed

14   the jurors that they should not hesitate to change their views, it advised them to do so only if they

15   were "convinced" their prior vote was "wrong." Id. at 1118.  The instruction did not advise the

16   jurors to acquiesce in the majority decision, but stressed that each juror should carefully weigh

17   the evidence and "decide the case for yourself." Id.  The form of the instruction, and these

18   comments in particular, minimized any coercive effect the supplemental instruction may have

19   otherwise had. See Navellier v. Sletten, 262 F.3d 923, 943 (9th Cir. 2001) (the "essential

20   question" in determining whether a judge's comments are coercive "is whether the court made

21   clear to the jury that all matters of fact are for its determination"). Cf. Jiminez, 40 F.3d at 981 &

22   n.5 (noting that failure to instruct jurors to hold on to conscientiously held beliefs "weighs

23   heavily in favor of the conclusion that the defendant's right to a fair trial and impartial jury has

24   been violated"); Mason, 658 F.2d at 1271 (finding an Allen charge improper where jury was

25   informed that "[i]f, on the other hand, the majority was for acquittal, the minority ought to ask

26   /////

1   themselves whether they might not reasonably doubt the correctness of the judgment which was

2   not concurred in by the majority").

3            Turning to the second factor, the length of time the jurors in petitioner's case

4   deliberated after receiving the trial court's supplemental instruction suggests that the instruction

5   did not influence or coerce the verdict.  After receiving the supplemental jury instruction,

6   petitioner's jurors deliberated for the rest of that day and returned after the weekend, reaching a

7   unanimous guilty verdict on the charge of attempted murder within a couple of hours.  In similar

8   situations, the Ninth Circuit has found no coercive effect resulting from an Allen charge.  See

9   e.g., United States v. Bonam, 772 F.2d 1449, 1450-51 (9th Cir. 1985) (finding no coercion where

10  there was one day in total of deliberation, one-and-a-half hours of which came after Allen

11  charge); Lorenzo, 43 F.3d at 1307 & n.3 (no coercion with five-and-a-half hours of deliberation

12  coming after Allen charge).  But see Weaver, 197 F.3d at 366 (coercion found to exist when jury

13  returned with unanimous verdict five minutes after receiving Allen charge).  In addition, the

14  jury's verdict in this case came after a weekend recess.  In Steele, the Ninth Circuit made the

15  following observation:

16          The fact the jury reached its verdict half an hour after returning
            from a weekend recess could merely reflect that the jurors came to
17          a resolution during a weekend when they individually pondered the
            evidence.  The weekend interval itself probably would have diluted
18          any coercive effect of an Allen charge given the prior Thursday.

19  Id., 298 F.3d at 911.  See also Berger, 473 F.3d at 1093 (no coercion where, among other things,

20  the jury verdict came after a long holiday weekend).  Similarly in this case, any potential for

21  coercion would have been diluted by the weekend break.

22           Turning to the third factor, this court concludes that there is no other indicia of

23  coercion in this case.  The trial court's supplemental instruction was not directed toward a

24  specific juror or set of jurors, but was addressed to the entire jury.  Further, the judge did not

25  know which of the jurors were in favor of any particular verdict, and he did not ask for a

26  numerical breakdown of the jurors' votes.  In fact, "the judge did not even know whether the

1   majority position was to convict or acquit." <u>Berger</u>, 473 F.3d at 1093 (quoting <u>Lorenzo</u>, 43 F.3d

2   at 1307).  Under the circumstances presented here, there is no indication from the record that the

3   trial court's charge had a coercive effect on the jury verdict.  <u>Cf. United States v. Ajiboye</u>, 961

4   F.2d 892, 893-94 (9th Cir. 1992) (reversal required if the trial judge "inquires into the numerical

5   division of the jury and then gives an <u>Allen</u> charge," or "if the holdout jurors could interpret the

6   charge as directed specifically at them-that is, if the judge knew which jurors were the holdouts

7   and each holdout juror knew that the judge knew he was a holdout").

8          The decision of the California Court of Appeal rejecting petitioner's claim of

9   coercion of the verdict through jury instruction error is not contrary to or an unreasonable

10  application of the federal due process standards set forth above and should not be set aside.  The

11  trial judge's failure to inquire whether further deliberations could produce a verdict does not

12  change this result.  <u>See United States v. Sommerstedt</u>, 752 F.2d 1494, 1497-98 (9th Cir.),

13  <u>modified</u>, 760 F.2d 999 (9th Cir. 1985) (question of whether to declare a mistrial when a jury

14  indicates it is deadlocked is left to the sound discretion of the trial court after consideration of all

15  the relevant circumstances); <u>United States v. Goldstein</u>, 479 F.2d 1061, 1069 (9th Cir. 1973)

16  (trial court is in the best position to determine the likelihood that a jury will be able to reach a

17  verdict).  Under the circumstances, and looking at the record as a whole, this court concludes that

18  the trial judge's supplemental instruction did not unduly coerce the jury to render a unanimous

19  verdict or otherwise render petitioner's trial fundamentally unfair.  Accordingly, relief on this

20  claim should be denied.

21          C.  <u>Failure to Instruct the Jury with CALJIC No. 3.32</u>

22          Petitioner's second claim is that the trial court violated his right to due process

23  when it refused to instruct the jury with CALJIC No. 3.32.  (Pet. at 5.)  The California Court of

24  Appeal fairly described the background to this claim and its decision thereon as follows:

25  /////

26  /////

Defendant argues the trial court erred in denying his request to instruct the jury with CALJIC No. 3.32 (evidence of mental disease-received for a limited purpose).  This instruction states in relevant part:

"You have received evidence regarding a mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crime charged.  You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or harbored malice aforethought which is an element of the crime charged."

Defendant argues CALJIC No. 3.32 was warranted because his mental condition was relevant to whether he harbored malice aforethought and/or premeditated and deliberated his actions.  As we shall explain, the trial court correctly refused the instruction because there was insufficient evidence that defendant suffered from any mental disease, defect, or disorder at the time of commission of the offense.

Defendant's request for CALJIC No. 3.32 flowed from the expert testimony given by Dr. Fred Rosenthal, which we have recounted above.

Following the evidentiary phase of the trial, defense counsel requested the court to instruct with CALJIC No. 3.32.  Counsel believed there was evidence, specifically the testimony of Dr. Rosenthal, that could allow the jury to find defendant was suffering from a drug-induced psychosis at the time of the stabbing, and that such psychosis falls within the definition of mental defect or mental disease as set forth in CALJIC No. 3.32.

The prosecutor objected to the giving of the instruction, arguing that no evidence had been presented defendant was suffering from any psychosis or any bizarre thoughts before defendant carried out the stabbing.  The prosecutor further argued Dr. Rosenthal's testimony about the generic ramifications for some people from smoking rock cocaine was not sufficient to allow the defense to bootstrap an instruction telling the jurors that they had received evidence that defendant in fact was suffering from a mental defect or mental disease.  The People argued the real issue before the jury was whether defendant's voluntary intoxication was such as to impair his mental state, and that the appropriate CALJIC instruction (No. 4.21.1-which addresses the issue of voluntary intoxication where relevant to mental state) should be given on that issue.

In denying defense counsel's request to instruct with CALJIC No. 3.32, the trial court noted there was an insufficient basis warranting the instruction.  The court concluded instructions on voluntary

17

intoxication were the only proper instructions to give, although it further indicated it would not limit counsel's right to comment on Dr. Rosenthal's testimony in closing argument.  In fact, the trial court instructed on voluntary intoxication.[3]

CALJIC No. 3.32 is in the nature of a pinpoint instruction that is required to be given only on request where the evidence supports the defense theory.  (People v. Ervin (2000) 22 Cal.4th 48, 91, 91 Cal.Rptr.2d 623, 990 P.2d 506.)  Indeed, the general rule is that a trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense.  (In re Christian S. (1994) 7 Cal.4th 768, 783, 30 Cal.Rptr.2d 33, 872 P.2d 574.)

/////

/////

---

[3]  The jury was instructed with CALJIC No. 4.21.1 as follows:

"In the crime of attempted murder which the defendant is accused in Count One, a necessary element is the existence in the mind of the defendant of the specific intent to kill another human being.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required specific intent. If, from all the evidence, you have a reasonable doubt whether the defendant formed that specific intent, you must find that he did not have such specific intent.

"It is also alleged in Count One that the crime attempted was willful, deliberate and premeditated murder. If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether the crime attempted was willful, deliberate and premeditated murder.

"Intoxication of a person is voluntary if it results in the willing use of any intoxicating liquor or any substance knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect.

"Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance."

Defendant claims because he was suffering from a psychotic state induced by smoking a substantial amount of rock cocaine at the time he stabbed the victim, it was error for the trial court not to instruct with CALJIC No. 3.32. In support of this argument, defendant relies on People v. Smithey (1999) 20 Cal.4th 936, 86 Cal.Rptr.2d 243, 978 P.2d 1171 (Smithey).

In Smithey, three defense experts examined and tested defendant and concluded defendant had organic brain damage, a generally diffused brain dysfunction, and mild mental retardation. In addition, the evidence at trial, which included a toxicology analysis of defendant's blood, indicated defendant was suffering from classic amphetamine-psychosis syndrome. Defendant also had amnesia with regard to the events on the day of the crime. The experts opined absent these disorders defendant would not have committed the crime. In Smithey, the trial court instructed with CALJIC No. 3.32.

Defendant also relies on People v. Aguilar (1990) 218 Cal.App.3d 1556, 267 Cal.Rptr. 879 (Aguilar ) (disapproved on other grounds in People v. Ervin, supra, 22 Cal.4th at pp. 90-91, 91 Cal.Rptr.2d 623, 990 P.2d 506), which held the trial court erred in not instructing with former CALJIC No. 3.36 (current No. 3.32). In Aguilar, defense psychology experts examined defendant and reached specific conclusions regarding his mental state; specifically, defendant suffered from paranoid personality traits which could have been caused or exacerbated by his cocaine use, and which would have impaired his judgment or caused him to overreact if he felt threatened. (Aguilar, supra, 218 Cal.App.3d at p. 1569, 267 Cal.Rptr. 879.)

In contrast to the personal observations made by the experts in Smithey and Aguilar, in this case Dr. Rosenthal did not examine defendant. As a result, Dr. Rosenthal testified only as to the general effects rock cocaine may have on chronic users, and even then he admitted the effects can vary from person to person. Dr. Rosenthal did not examine, test, nor evaluate defendant, nor did he opine defendant was suffering from a mental disease, mental defect, or mental disorder when defendant stabbed the victim.

Given the foregoing, the trial court did not err in refusing to instruct with CALJIC No. 3.32. "Mental illness [or mental defect] is a medical diagnosis ...." (People v. Kelly (1992) 1 Cal.4th 495, 540, 3 Cal.Rptr.2d 677, 822 P.2d 385, italics added.) Expert medical testimony is necessary to establish a defendant suffered from a mental disease, mental defect, or mental disorder because jurors cannot make such a determination from common experience. (See Conservatorship of Torres (1986) 180 Cal.App.3d 1159, 1163, 226 Cal.Rptr. 142.)

/////

The cases we have found that approve the giving of CALJIC No. 3.32 have all done so where expert medical testimony was adduced on the question of defendant's mental disease, etc.  (See People v. Musselwhite (1998) 17 Cal.4th 1216, 1229-1230, 1247-1249, 74 Cal.Rptr.2d 212, 954 P.2d 475 [expert testimony defendant suffered from mental disease; trial court properly gave an instruction consistent with CALJIC No. 3.32]; People v. Cox (1990) 221 Cal.App.3d 980, 987, 270 Cal.Rptr. 730 [same]; People v. Molina (1988) 202 Cal.App.3d 1168, 1171, 249 Cal.Rptr. 273 [same]; People v. Young (1987) 189 Cal.App.3d 891, 907-909 and fn. 6, 234 Cal.Rptr. 819 [same].)

Defendant requested an instruction that would have stated to the jury that it had received evidence of a mental disease, mental defect, or mental disorder of the defendant at the time of the commission of the crime charged, even though no such competent evidence was presented.  Without expert medical testimony establishing that defendant was suffering from a mental disease, defect, or disorder at the time of the commission of the crime, there was no evidentiary or legal basis for the trial court to instruct with CALJIC No. 3.32.  (See People v. Maxey (1972) 28 Cal.App.3d 190, 199, 104 Cal.Rptr. 466 [no expert testimony as to defendant's "unsound mind"]; compare People v. Williams (1971) 22 Cal.App.3d 34, 52, 99 Cal.Rptr. 103 [psychiatrists testified as to defendant's "abnormal brain, one even of his being insane, of his mind being temporarily gone"].)

In light of the evidence presented, defendant was entitled to instructions on voluntary intoxication and such instructions were given by the court.  In our view, these instructions fully and properly allowed the jury to consider defendant's claimed intoxicated state at the time of the incident and whether, because of that state, defendant actually formed the specific intent to kill, or premeditated or deliberated his criminal conduct. (§ 28.)

The trial court correctly instructed on voluntary intoxication and correctly refused to instruct on mental disease, defect, or disorder with CALJIC No. 3.32.

Murphy, 96 Cal. App. 4th at 1114-17.

The conclusion of the California Court of Appeal that the trial court's refusal to instruct the jury with CALJIC No. 3.32 did not violate state law is not reviewable in this federal habeas corpus proceeding.  Middleton, 768 F.2d at 1085.  With regard to petitioner's federal due process claim, this court agrees with the state court's conclusion, based on its careful review of the evidence, that petitioner's right to a fair trial was not violated by the failure of the trial court

1   to instruct the jury with CALJIC No. 3.32.  Given the evidence introduced at trial, petitioner's

2   jury was appropriately instructed concerning his mental state at the time of the crime.  In light of

3   the instructions given with respect to voluntary intoxication and the jury's consideration of such

4   evidence in determining both specific intent and whether the crime attempted was willful,

5   deliberate and premeditated murder, petitioner was not prejudiced by the trial court's refusal to

6   give CALJIC No. 3.32.  See Turner v. Calderon, 281 F.3d 851, 867 (9th Cir. 2002).

7                                                  CONCLUSION

8                   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

9   a writ of habeas corpus be denied.

10                  These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: June 12, 2008.

19

20                                                    _____

21                                                    DALE A. DROZD
                                                     UNITED STATES MAGISTRATE JUDGE

22  DAD:8
    moore1128.hc

23

24

25

26